(No. 55861.—

*In re* RONALD T. KINK, Attorney, Respondent.

*Opinion filed October 22, 1982.*

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte and David J. Walker, of counsel), for respondent.

JUSTICE MORAN delivered the opinion of the court:

On July 25, 1980, the Administrator of the Attorney Registration and Disciplinary Commission filed a three-count complaint before the Commission charging respondent, Ronald Kink, with professional misconduct. Count I alleged that respondent was negligent in the administration of an estate, and that he made certain misrepresentations in connection with the settling of that estate. Counts II and III charged him with the negligent administration of two other estates. The Hearing Board found respondent guilty only of the three neglect counts, and recommended that he be reprimanded. The Administrator filed exceptions with the Review Board, which subsequently issued a report adopting the findings and recommendation of the Hearing Board.

Two issues are raised on appeal: (1) Did the hearing and review boards err in finding that the misrepresentations alleged in count I were not proved by clear and convincing evidence? (2) Is reprimand an appropriate sanction under the circumstances of this case?

The facts relevant to count I of the complaint are as follows. William Honert died intestate in October of 1974. His estate consisted of a parcel of real estate located in McHenry County, an automobile, and $10,131.90 deposited in a bank account in the name of decedent, as trustee for Joseph Stryszak and Lucille Day. On October 18, 1974, respondent was retained as the attorney for the estate by Stryszak and Day. They informed him that Mary Nelson, one of the decedent's relatives, was adopted. Respondent indicated that he would need her adoption certificate in order to settle the estate.

In December of 1974, respondent filed a petition for letters of administration. A proof of heirship proceeding was conducted, during which Day testified as to Nelson's adoptive status. Subsequently, respondent was advised by the court reporter that an order declaring heirship would not be entered until an authenticated decree evidencing the adoption was provided. He was further informed that a failure to produce the decree may result in the testimony at the heirship proceeding being stricken. The adopted heir apparently refused to produce the necessary certificate. However, Stryszak obtained a copy thereof in April of 1976.

According to respondent's testimony, he later learned that there were procedures to avoid the requirement of producing the adoption certificate. He could have petitioned either for waiver of the adoption decree or to have the adopted heir's money deposited with the county treasurer until proper certification was presented. He concedes he never investigated the possibility of an appropriate legal remedy and did not advise the court of his difficulty in obtaining the adoption decree.

The evidence further indicated that a prospective purchaser was procured for the decedent's automobile. In order to effect the necessary transfer of title, respondent was required to submit an affidavit to the Secretary

of State. He stated in the affidavit that no petition for letters of administration was pending, and that there were no creditors of decedent's estate. In fact, the petition was currently pending, and there was an outstanding doctor bill in the amount of $372. If respondent had acknowledged these circumstances in the affidavit, it is likely that the transfer of title would not have been issued.

Respondent testified that he erroneously believed the letters of administration were no longer pending because he never produced the adoption decree. However, he concedes that he was not informed the proceedings were terminated, nor did he check the court file to ascertain the status of the proceedings. When the Administrator inquired as to the reason, respondent indicated that he may have had a psychological problem and was in a "quandary" as to how to proceed with the estate.

With regard to the omitted doctor bill, respondent claimed that he reached an agreement with the doctor whereby the latter would be paid from the proceeds of the real estate sale described below. Consequently, he did not consider the doctor to be a creditor of the estate. Respondent's testimony was the only evidence of this agreement. He also indicated that the bill was omitted from an inheritance tax consent form because there was a question as to whether it was covered by insurance.

In August of 1976, Day entered into a contract to sell the real estate in McHenry County. Respondent was aware in September that the purchasers were prepared to close the transaction. He met with Day and Stryszak on May 20, 1977, at which time they signed consents to the sale. On September 12, 1977, respondent informed Stryszak that he had mailed the required consents to the remaining heirs. As of that date, however, he had not done so.

Three days later, Stryszak filed a complaint with the

Disciplinary Commission, alleging respondent's failure to close the estate and to respond to Day's inquiries. On October 31, 1977, respondent gave Day the consents to obtain the signatures of the remaining heirs. On the same day, he informed the Commission that his client received the consents and would return them, executed, on November 14, 1977. He further indicated that he would file the petition that week. In apparent reliance on respondent's representations, the Commission subsequently closed its investigation. However, when Day appeared at respondent's office on the appointed date, he was not present. The petition was never filed.

In December of 1978, Day and Stryszak filed another complaint with the Disciplinary Commission, alleging that the estate was still not closed and taxes were unpaid. The following December, 1979, a complaint was voted against respondent. As of that date, he had not filed any pleadings in connection with the estate since 1974, or obtained the necessary approval for the sale of the real estate. He did, however, accept a $575 fee, $500 of which was attributable to his services performed in connection with the estate. Following the institution of the second complaint, respondent's clients discharged him and retained another attorney.

The evidence relevant to count II of the complaint indicates that, in April of 1972, William Rachner spoke with respondent concerning the estate of his deceased father, Rudolph Rachner. At the time of his death, the decedent owned two parcels of real estate, stock in two corporations, and an interest as a joint tenant in two savings accounts. Rachner's will left 50% of his property to his daughter, Grace, 40% to his son, William, and 10% to his grandson, Wayne Kofron. Grace and William each resided in the two homes which decedent owned.

Because there were few assets to be distributed, respondent suggested that the estate be settled by means

of a bond in lieu of probate. He advised William and Grace to purchase the homes, and divide the proceeds according to the terms of the will. Kofron, however, demanded a one-third share of the estate and insisted that probate proceedings be instituted. In addition, Kofron withdrew all of the funds from one of the savings accounts, which he held jointly with the decedent and Grace. Respondent notified Kofron that unless the funds were returned by February 5, 1974, he would institute judicial proceedings. Kofron did not respond, and respondent never instituted proceedings against him. Respondent explained that he believed there was no cause of action on behalf of the estate and the only remedy was for Grace to file suit if she desired.

Probate proceedings were initiated in July of 1975, and as of December 1979 the estate was still not closed and tax proceedings were never instituted. Respondent asserts that the proceedings were delayed because Grace, who was serving as executor of the will, suffered a nervous breakdown. In September of 1975, William was appointed as personal representative. In addition, respondent was advised by William that he was having marital problems, and to suspend further action temporarily. There is conflicting testimony as to when respondent was so advised, and when William informed him to continue proceedings. Respondent testified that he was told to suspend further action in 1976 and to proceed again sometime later that year. We note that, in his amended answer, respondent stated that he was told to continue proceedings in 1978. William testified that he informed respondent of his marital problems in 1975, and requested, about one month later, that he proceed.

With regard to count III, the evidence established that, in May of 1978, respondent was retained by Lenore Passow to settle the estate of her deceased sister, Alice Butler. At the time of her death, the decedent owned an

undivided one-half interest in certain real estate, and approximately $70,000 deposited in a number of savings accounts. Respondent instituted probate proceedings on June 15, 1978. A few days later he informed Passow that he would arrange for prompt payment of the funeral bill. He never did, however, and in August of 1978 his client paid the bill, with interest, from her own funds.

Respondent obtained inheritance tax releases for the savings accounts in November of 1978. He testified that the delay was attributable to the amount of work in which he was involved. Apparently, several months elapsed after the releases were secured before respondent submitted to certain heirs the funds to which they were entitled.

In January of 1979, the real estate was sold and respondent appeared at the closing on behalf of the estate and the owners of the other one-half interest in the property. Respondent withheld from the proceeds of the sale an amount equal to the estimated inheritance tax, $600 as his fee for services related to the sale, $256 as reimbursement for costs advanced, and $2,500 as his fee for services rendered to the estate.

Respondent listed as one of his costs advanced a $65 appraisal fee in connection with the real estate sale. In fact, Passow had already paid the fee and so advised respondent. He informed her that he would investigate the matter and send her a check for any reimbursement due. He did so, but not until August of 1979. Respondent testified that he had assumed he paid the fee because it was his custom and practice to do so. The estate was closed in November, 1979.

The Administrator first contends that the misrepresentations alleged in count I were proved by clear and convincing evidence. He asserts that respondent purposefully submitted the false affidavit, and lied to this

client regarding the consent forms, in order to conceal his neglect in handling the estate.

The findings of the Hearing Board are entitled to substantially the same weight as that of any trier of fact with respect to the resolution of factual matters. (*In re Feldman* (1982), 89 Ill. 2d 7, 10; *In re Mandell* (1982), 89 Ill. 2d 14, 23.) "Where the question is the credibility of witnesses, resolution of conflicting testimony, or other such fact-finding judgments, the hearing panel should be afforded a good deal of deference." (*In re Hopper* (1981), 85 Ill. 2d 318, 323; see also *In re Chernoff* (1982), 91 Ill. 2d 316, 324-25.) Here, respondent's conduct in filling out the affidavit could be interpreted as either fraudulent or innocent. The Hearing Board chose to accept respondent's version of the events, and we see no reason to upset its findings. We recognize that the Hearing Board failed to address the question of the doctor bill omitted from the affidavit. Instead, it determined that respondent did not fraudulently conceal the bill from the petition for inheritance tax consents. On this point, we are not prepared to hold that the alleged misrepresentation was proved by clear and convincing evidence.

Less reasonable is the Board's conclusion that respondent's statement to Stryszak was not deceitful. Respondent concedes that he made the statement, that it was untrue, and he offers no explanation therefor. From our review of the record the Administrator did establish, by clear and convincing evidence, that the respondent's comment to his client constituted a misrepresentation.

We turn now to the question of what sanction should be imposed. Respondent concedes that he was negligent in his handling of the three estates, and does not assert that discipline would be inappropriate. Rather, he urges that we adopt the recommendations of the hearing and review boards and order that he be reprimanded.

Although the recommendations of the boards may be

considered, still "the final responsibility for imposing discipline rests with this court." (*In re Schuyler* (1982), 91 Ill. 2d 6, 18; *In re Sherman* (1975), 60 Ill. 2d 590, 593.) In determining the appropriate sanction, we must consider all the facts and circumstances. "Nevertheless, where the facts are similar to those in other cases, a uniform standard of discipline should be sought." *In re Feldman* (1982), 89 Ill. 2d 7, 11; *In re Clayter* (1980), 78 Ill. 2d 276, 283.

Our review of the relevant cases fails to reveal any in which a reprimand was imposed for misconduct similar to that involved in the instant case. Respondent has manifested a lack of care in his dealings with three separate clients, two instances of which extended over a period of years. It is clear that he was less than candid with at least one client. There is also evidence that he remained inaccessible despite attempts to contact him. As a result of respondent's dilatory conduct, certain clients did not promptly receive the estate funds to which they were entitled. Under these circumstances, we cannot agree with the hearing and review boards that a private reprimand is sufficient discipline. .

"The traditionally high standards of the legal professsion impose upon an attorney the duty to represent a client with zeal and diligence." (*In re Chapman* (1978), 69 Ill. 2d 494, 501.) This, respondent has clearly failed to do. However, we recognize that his misconduct was apparently not prompted by a dishonest motive, which is a factor to consider in determining the severity of the discipline. (*In re Clayter* (1980), 78 Ill. 2d 276, 283.) In cases where, as here, an attorney's misconduct consists of negligence or mistaken judgment, censure or suspension are appropriate sanctions. (*In re Saladino* (1978), 71 Ill. 2d 263, 276.) The Administrator, in reliance on this court's opinion in *In re Taylor* (1977), 66 Ill. 2d 567, argues that respondent should be suspended from the

practice of law for at least one year.

In *Taylor*, the Administrator filed a four-count complaint charging respondent with professional misconduct. Count I alleged that respondent was retained to represent a defendant in a criminal matter but never appeared at the scheduled hearing. Count II charged that he accepted a fee to represent a woman in initiating divorce proceedings. He never commenced the action. The Hearing Board found insufficient evidence to support the third count. Count IV alleged that he was retained in a wrongful death case but failed to take any action other than enter an appearance on his client's behalf.

This court, after noting "that respondent's actions show a pattern of consistent neglect" (66 Ill. 2d 567, 572), ordered that he be suspended from the practice of law for a period of one year. Significantly, the opinion recited no circumstances which would tend to mitigate or explain respondent's misconduct. There was also a strong indication that respondent was untruthful in his testimony before the Hearing Board.

These factors serve to distinguish *In re Taylor* from the instant case. Here, the Board specifically found that respondent was cooperative and candid during the proceedings, a circumstance which is "of some significance in determining the punishment to be imposed." (*In re Damisch* (1967), 38 Ill. 2d 195, 208.) Although respondent was negligent and dilatory in representing his clients' interest, he did render *some* services on their behalf. In addition, a number of witnesses testified as to his excellent reputation in the community, and he has an outstanding record of involvement in civic and religious programs.

We note also that the building in which respondent's former law office was located caught fire in 1975 or 1976, and he was forced to relocate. The Hearing Board determined that this circumstance disrupted respond-

ent's "already disorganized practice." For these reasons, *In re Taylor* is inapposite to the instant case.

We also find distinguishable other cases in which respondent was suspended for similar misconduct. In *In re Chapman* (1978), 69 Ill. 2d 494, respondent failed to prosecute three appeals. In two appeals, the client was not damaged by respondent's neglect. However, because of respondent's dilatory conduct, the other client was denied an appeal. In addition, respondent manifested a greater lack of candor in dealing with his client than is evidenced in the instant case. He also failed to pay his attorney registration fee until the hearing commenced, and failed to respond to the Commission's letters pertaining to the charges. The court recited certain mitigating factors and ordered respondent suspended for three months.

The respondent in *In re Simpson* (1971), 47 Ill. 2d 562, suffered a one-year suspension for accepting fees from two clients for work which he failed to perform. However, the court specifically found that respondent's conduct involved moral turpitude because he intended to retain for his own use the unearned fees. Finally, in *In re Levinson* (1978), 71 Ill. 2d 486, the respondent failed to prosecute an adoption proceeding for which he had been paid. In ordering him suspended for six months, this court noted that he also misrepresented certain facts to his clients, failed to pay his attorney registration fee, and did not file an answer or appear before the hearing and review boards.

We find the circumstances involved in *In re Ahern* (1961), 23 Ill. 2d 69, more closely analogous to the instant case. There, respondent failed or neglected to fully perform services for which he was paid in six separate instances. Although this court noted that suspension could be a proper sanction, it determined that censure was sufficient discipline. The court recited as mitigating

factors the illness of his child, the death of his wife, and respondent's prior unblemished reputation.

Respondent's conduct in the instant case was not more egregious than that involved in *In re Ahern*. Further, respondent has now joined a law firm and believes that the new association will eliminate future instances of neglect. He has also disengaged himself from certain civic commitments, having realized they interfered with his practice. The Hearing Board has determined that "it is unlikely that events of this kind will happen again."

"The purpose of a disciplinary proceeding is to safeguard the public and maintain the integrity of the legal profession." (*In re Levin* (1979), 77 Ill. 2d 205, 211.) We do not believe that either of these purposes will be served by suspending respondent. Accordingly, it is ordered that respondent be censured.

*Respondent censured.*