(No. 65344.—)

*In re* LAWRENCE S. KOMAR, Attorney, Respondent.

*Opinion filed December 15, 1988.*

STAMOS, J., took no part.

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Warren Lupel, of Chicago, for respondent.

JUSTICE WARD delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a complaint charging the respondent, Lawrence Komar, with violating the Illinois Code of Professional Responsibility (107 Ill. 2d R. 1—101 et seq.) and one of the predecessor codes of professional conduct.

The complaint alleged that the respondent was an officer and owned a one-third interest in Fiscal Management, Inc. (Fiscal), a corporation which, in turn, owned 75% of the stock in Midland Equities, Inc. (Midland). The complaint charged that between July 27, 1978, and September 16, 1981, "Midland sent various written com-

munications, including letters and mailgrams, to defendants in foreclosure proceedings advising that Midland had devised a plan to help save their homes and requesting that they contact Midland immediately." It was also alleged that during this same period more than 1,000 persons executed contracts with Midland, pursuant to which Midland would receive a $1,000 fee for performing one of the following services: obtaining a loan commitment to pay the mortgage arrearage; obtaining a purchaser to buy the real estate with an option to repurchase; retaining counsel to determine the legal status of the foreclosure action and negotiate on behalf of the client prior to the foreclosure sale; or obtaining competent counsel to file a bankruptcy petition under chapter 13 of the United States Bankruptcy Code. In most instances, the customer, in exchange for the $1,000 fee, received simply a legal review of his case or was referred to a bankruptcy attorney. Midland never arranged to sell a client's home to another with a repurchase option, and in only a few instances did it obtain refinancing.

The respondent, it was alleged, provided legal services for Midland's customers incident to the contract and received a fee of $200 from Midland per customer. The complaint also alleged that the respondent failed to inform the individuals to whom he furnished legal advice that he had an interest in Midland. The Administrator alleged also that on March 10, 1981, Capital Concepts, Inc., was incorporated, and that until September 16, 1981, Capital, using the respondent's services, handled some of Midland's business.

The complaint charged that the respondent violated disciplinary rules of the Illinois State Bar Association Code of Professional Responsibility (1977) by acts committed prior to July 1, 1980, and rules of the Illinois Code of Professional Responsibility (107 Ill. 2d R. 1—101 et seq.) by later conduct. Specifically, the respondent was

charged with violating Disciplinary Rule (DR) 2—101 and Rule 2—101 by participating in the use of a form of public communication that included a deceptive statement; practicing under a name which is misleading as to identity, responsibility or status in violation of DR 2—102(B) and Rule 2—101; soliciting professional employment in violation of DR 2—103(B), DR 2—103(D) and Rule 2—103; accepting employment in violation of DR 2—104 and Rule 2—104; violating DR 3—101(A) and Rule 3—101(a) by aiding another in the unauthorized practice of law; violating DR 3—102(A) and Rule 3—102(a) by sharing legal fees with a nonlawyer; violating DR 3—103(A) and Rule 3—103(a) by forming a partnership with a nonlawyer; violating DR 5—101(A) and Rule 5—101(a) by accepting employment when his professional judgment may have been affected by his own financial, business, property or personal interests; violating DR 5—107(B) and Rule 5—107(b) by accepting compensation for legal services from one other than a client; entering into an agreement for, charging or collecting an illegal or excessive fee in violation of DR 2—107 and Rule 2—106; failing to refund promptly any part of a fee paid in advance in violation of DR 2—111 and Rule 2—111(a)(3); and engaging in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of DR 1—102(A)(4) and Rule 102(a)(4).

Specific counts alleged instances where individuals responded to Midland's or Capital's solicitations, executed a contract after an interview with a Midland or Capital representative, and advanced either the entire $1,000 called for in the contract or a portion of it. Other counts alleged that there were customers who claimed a refund of the fee after one of Midland's or Capital's representatives referred the customer's case to a bankruptcy attorney or the customer obtained financing on his own, but no refund was ever received. The conduct alleged in

each of these counts of the complaint constituted, it charged, was a violation of the disciplinary rules set out above.

In addition, there was one count charging the respondent with solicitation of employment in violation of Rule 2—103. That count charged that on or about March 1981, Charles Daniels received a telephone call from a person who identified himself as the respondent and stated that he was aware of a pending foreclosure action brought against Daniels. At the caller's request, Daniels met the respondent at his office and agreed to pay him $1,000 as a fee. The respondent filed an appearance on behalf of Daniels in the foreclosure litigation, and thereafter, Daniels paid the respondent $500.

The respondent filed an answer to the Administrator's complaint on December 2, 1983, admitting all of its factual allegations, but denying that they constituted misconduct warranting discipline. On January 12, 1984, the respondent filed a motion for judgment on the pleadings, which was denied by a panel of the Hearing Board of the Commission. After a hearing, a majority of the panel found that each allegation of misconduct in the complaint had been proved by clear and convincing evidence, and recommended that the respondent be suspended from the practice of law for a period of six months. The panel observed that the solicited group was composed of desperate, unemployed, minimally educated, unsophisticated persons, distraught by the threatened loss of their homes. The dissenting member of the panel considered that only financial counseling was involved and voted that the complaint be dismissed.

The Administrator and the respondent filed exceptions before the Review Board, and on March 2, 1987, the Review Board unanimously approved the report and recommendations of the Hearing Board. The Administrator filed exceptions regarding the sanction recommended

by the Hearing and Review Boards, and we allowed the respondent's motion to allow his exceptions to the Hearing Board's report to stand as his exceptions to the report of the Review Board.

The respondent is 44 years of age and was admitted to the bar of Illinois in 1969. In 1976, the respondent and two other individuals, who were nonlawyers, formed Fiscal Management, Inc., whose stated purpose was to arrange financing for commercial borrowers. The respondent owned one-third of the corporation's stock. In July 1978, the respondent and Lloyd Baretz, Norman Behrens and Michael Wichman, who were nonlawyers, formed Midland Equities, Inc. Fiscal acquired 75% of the corporation's stock and Michael Wichman owned the other one-fourth share. The respondent, Baretz, Behrens and Wichman were made directors of the corporation, and the respondent was named as president of Midland.

Between its formation, in July of 1978, and September of 1981, Midland mailed a variety of fliers, ads and other solicitations to owners of single-family dwellings which were the subject of pending mortgage foreclosure actions filed in the circuit court of Cook County. The respondent testified that he was aware of these mailings and had reviewed them prior to distribution. He denied he took part in their drafting or distribution however.

Between July 7, 1978, and December 31, 1980, approximately 2,000 individuals named in foreclosure actions responded to the solicitations and were interviewed by either Gina Miller, an employee of Midland, Baretz, Behrens or Wichman. Approximately 1,000 persons executed contracts with Midland, the terms of which provided that Midland would receive a $1,000 fee if it provided a "solution" to the foreclosure action that would permit the client to remain in his or her home. According to the contract, the proposed solutions included: (1) obtaining refinancing; (2) finding a purchaser

for the customer's home who would consent to an option to repurchase; (3) retaining counsel to determine the legal status of the foreclosure action and negotiate on behalf of the client; or (4) obtain counsel to file a bankruptcy petition. Before the contract was signed, the customer was told that in the event Midland's efforts were unsuccessful in avoiding foreclosure, the $1,000 fee would be refunded.

The evidence was that the respondent participated in drafting the form contract and that he interviewed customers after they had signed contracts. The respondent would introduce himself to the customer as an attorney, explain the alternative "solutions" available under the contract and make a "legal analysis" of their case. He testified that he would review the foreclosure petition for legal sufficiency, and in certain instances, he filed an appearance on behalf of the customer. The Hearing Board panel found that Midland paid the respondent $200 from each $1,000 fee received from foreclosure defendants.

The evidence showed that in most instances the "solution" provided the customer was simply a referral to a nonassociated attorney for the filing of a chapter 13 bankruptcy petition. The respondent testified that in less than 15% of the cases did Midland arrange for financing. In no case, it appears, did the respondent or anyone associated with Midland inform the customer that the respondent had an interest in Midland or that he received compensation from Midland for legal services for its customers.

In the spring of 1979, the respondent resigned as Midland's president and unsuccessfully attempted to sell his interest in Midland to Gina Miller. The respondent acknowledged that after Midland ceased operations in 1981, he conducted the same activity as that performed by Midland under "Capital Concepts, Inc." until Novem-

ber 1982. The record shows that Gina Miller was Capital's sole shareholder and that the respondent maintained both a professional and personal relationship with her. The respondent also acknowledged that his personal law office was located in the same suite of offices as Capital's and that he had a part ownership in the building in which the offices were located. During this time, the respondent received $1,000 to $2,000 per pay period in compensation from Capital.

The respondent argues that the Hearing Board erred in denying his motion for judgment on the pleadings on the ground that the Administrator's complaint fails to set out facts which, if proved, would constitute ethical violations. His principal contention is that the facts do not show that he can be considered responsible for the actions of Midland or Capital. The respondent contends that because the complaint does not allege that he personally participated in soliciting Midland's or Capital's customers, or that the solicitations were sent at his direction, he cannot be held responsible for the corporations' actions. He argues, but inaccurately, that his only connection with Midland or Capital was that he owned stock in Midland and was one of its officers, and that he was simply an employee of Capital. Accordingly, the respondent concludes, the Administrator has failed to allege facts showing a violation of DR 2—101 or Rule 2—101.

The respondent also contends, but erroneously as will be pointed out, that because it was not alleged that he rendered legal services to Midland or Capital's customers, the Administrator has failed to plead facts alleging that he accepted compensation other than from a client; that he aided others in the practice of law; that he shared legal fees with a nonlawyer; or that he formed a partnership with nonlawyers. According to the respondent, the complaint can be construed as alleging simply

that he rendered legal services to Midland and Capital in the capacity of in-house counsel. Consequently, he says, the complaint does not set out sufficient facts of misconduct which would constitute violations.

In *In re Beatty* (1987), 118 Ill. 2d 489, 499, this court stated:

"The rules of the Commission require that a complaint state the facts of the misconduct charged and inform the lawyer of what he or she is accused. That reflects, of course, the basic law regarding the nature of a complaint which requires that it contain a statement of facts constituting the cause of action claimed. A complaint that does not allege facts, the proof of which are necessary to entitle a plaintiff to judgment, fails to state a cause of action. The complaint must contain factual allegations of every fact which must be proved in order for the plaintiff to be entitled to judgment on the complaint, and a judgment cannot be rendered on facts demonstrated by evidence at trial unless those facts shown were alleged in the complaint. [Citations.] The specific allegations of facts that must appear in a complaint depend on the nature of the cause of action claimed. The complaint here must have charged personal professional misconduct as to each defendant and have made specific factual allegations. While a pleading will not be held to be bad in substance if it contains sufficient information as will reasonably inform a defendant of what he must defend against, that liberality of pleading will not relieve the necessity that a complaint contain sufficient, factual averments and set out every fact essential to be proved."

See also *In re Harris* (1982), 93 Ill. 2d 285, 292.

We consider that the Administrator's complaint does allege sufficient facts which, if proved, would show ethical violations. It is of no matter that the complaint does not allege that the respondent personally participated in soliciting Midland's or Capital's customers. The complaint states that the respondent, through his ownership in Fiscal, owned a 25% interest in Midland; that part of

the "services" Midland proposed to render its clients was "retaining counsel to determine the legal status [of the foreclosure action]"; that the respondent performed the legal services promoted in the solicitations; and that Midland compensated the respondent for his services. The complaint also alleged that the respondent provided the same services for Capital's customers as he did for Midland's. It is clearly alleged in practical effect that Midland and Capital were in part soliciting business in which the respondent would share and participate as "retained counsel" and that he was aware of the solicitations.

Also, there is no merit to the respondent's contention that the complaint can be reasonably construed as alleging simply that he was Midland's or Capital's lawyer, performing services solely in the capacity as their in-house counsel. The complaint plainly states that the respondent provided "legal services *** for Midland customers"; that the respondent was compensated by Midland at a rate of $200 for reviewing the customer's case; and that the respondent did not disclose to Midland's customers that he had an interest in Midland. The allegations sufficiently state misconduct which, if proved, would have been a violation. The respondent's motion for judgment on the pleadings was properly denied.

The respondent next contends that the Administrator has failed to prove by clear and convincing evidence the ethical violations charged in the complaint.

The Administrator must prove each allegation by clear and convincing evidence. (*In re Enstrom* (1984), 104 Ill. 2d 410, 416; *In re Woldman* (1983), 98 Ill. 2d 248, 254; 107 Ill. 2d R. 753(c).) While the Hearing Board's findings are entitled to the same weight as those of any other fact finder (*In re Levin* (1984), 101 Ill. 2d 535, 539), this court will not accept the Board's findings

if they are not established by clear and convincing evidence. *In re Kink* (1982), 92 Ill. 2d 293, 301.

We would observe that the facts are not in dispute, as the respondent, in his answer to the Administrator's complaint and through a stipulation entered into before the panel of the Hearing Board, admitted the Administrator's factual allegations. The issue, therefore, is whether the facts establish violations.

The Administrator charged the respondent with violating DR 2—101 and Rule 2—101 (107 Ill. 2d R. 2—101) on the ground that the solicitations Midland and Capital sent were false, misleading and deceptive. (It should be observed that until July 1, 1980, when this court adopted the Illinois Code of Professional Responsibility, attorney conduct was governed under codes of professional conduct adopted by several bar associations, including the Illinois State Bar Association. The Administrator has charged the respondent with violating the Illinois State Bar Association's Code of Professional Responsibility (1977) for conduct occurring prior to the adoption of the Illinois Code of Professional Responsibility in 1980, and thereafter, with violations of the successor code.)

DR 2—101 provided:

"(A) A lawyer shall not, on behalf of himself, his partner or associate or any other lawyer affiliated with him or his firm, use or participate in the use of any form of public communication that includes any deceptive statement.

(B) As used in D.R. 2—101 through D.R. 2—104, a 'deceptive statement' means any communication that includes any false or misleading statement or omits to state any material fact necessary in order to make the statements made in such communication, in light of the circumstances under which they are made, not misleading. Without limitation a deceptive statement includes any communication that:

(1) fails to identify the lawyer making the communication;

(2) is intended or is likely to create an unjustified expectation;

\* \* \*

(6) contains statistical data or other information that is based on past performance or predicts future success;

\* \* \*

(9) is intended or is likely to attract clients by use of showmanship, puffery, self-laudation or hucksterism, or garish or sensational language or format; or

(10) fails to contain reasonable warnings or disclaimers necessary to make a representation in, or implication of, such communication not deceptive."

Rule 2—101 provides:

"A lawyer may publicize himself as a lawyer through any commercial publicity or other form of public communication \*\*\* provided that such communication meets all of the following conditions:

\* \* \*

As used herein, references to a 'lawyer' will permit inclusion of information as to the lawyer's law firm and the lawyer's partners or associates. Any communication made pursuant to this rule *must* include the name of at least one lawyer responsible for its content.

(b) Such communication shall contain all information necessary to make the communication not misleading and shall not contain any false or misleading statement or otherwise operate to deceive.

(c) The form of such communication shall be designed to communicate the information contained therein to the public in a direct, dignified and readily comprehensible manner." (Emphasis in original.) 107 Ill. 2d R. 2—101.

We agree with the Administrator that the solicitations contained in the record were misleading and deceptive in violation of DR 2—101 and Rule 2—101. As the Hearing Board found, the solicitations were sent to individuals who, for the most part, were "unemployed, minimally educated, unsophisticated and distraught by the threatened imminent loss of their homes by foreclosure." The

solicitations contained statements which created an unrealistic sense of urgency and assurances that Midland would save them from foreclosure. For example, one solicitation contained the following message:

> "We can help save your home. But you have to act *Now*! *ANY* delay can cost you *ANY* chance of saving your home." (Emphasis in original.)

The solicitations were also deceptive, as they implied that the services Midland provided were primarily financial. Illustrative of this was the following solicitation:

> "You may feel that there is very little or nothing can be done to save your home. Until now, that may have been true. BUT NO MORE. Our firm, *through its finance department*, has recently devised an innovative plan to help individuals such as you save your home. This plan is new and unique. This plan can help you if you act NOW!" (Emphasis added.)

Another provided:

> "Our business, Midland Equities, Inc., arranges means for refinancing real estate in an effort to allow people to remain in their homes."

There is obviously nothing "new" or "innovative" involved in Midland's proposed plans to avoid foreclosure. Too, the services Midland actually provided its customers involved few, if any, financing arrangements. The evidence showed that Midland obtained refinancing for fewer than 15% of its customers, and in approximately 80% of the cases, the respondent or one of Midland's representatives simply referred the customer to an attorney specializing in bankruptcy law.

The solicitations were misleading in that they failed to disclose that payment of the $1,000 fee typically would result simply in a referral to a bankruptcy attorney and that the customer would be required to pay an additional fee to that independent attorney. They were also misleading in that some of the solicitations were

signed in the name of fictitious signatories purported to be Midland's representatives.

In addition, the solicitations contained information assertedly based upon past performance or which predicted future events, contained statements as to the quality of services, and were likely to attract clients by the use of striking language. For example, one of the solicitations provided:

> "Our independent service organization has helped many, many people in the same situation. We can help you save your home. But you have to act *NOW! ANY* delay can cost you ANY chance of saving your home." (Emphasis in original.)

Another stated:

> "We can help save your home. Our firm usually finds solutions for people with foreclosure problems that enable them to remain in their homes."

In addition, none of the solicitations identified a lawyer connected with the communication in violation of Rule 2—101, which plainly states that "[a]ny communication made pursuant to this rule *must* include the name of at least one lawyer responsible for its content" (emphasis in original) (107 Ill. 2d R. 2—101).

We judge that the Hearing Board's findings that the described solicitations were deceptive and misleading in violation of DR 2—101 and Rule 2—101 were shown by clear and convincing evidence.

Too, the panel's finding that the respondent violated DR 2—102(B) and Rule 2—101, which prohibit an attorney from practicing under a misleading name, was based on clear and convincing evidence. Although the respondent was the only lawyer in the company's operation giving legal advice to over 1,000 persons, his name appears nowhere in the solicitation and he admitted that he failed to reveal that he had an interest in Midland.

The panel of the Hearing Board also correctly found by clear and convincing evidence that the respondent violated DR 2—103(B), DR 2—103(D) and Rule 2—103. DR 2—103 in substance provided:

"(B) A lawyer shall not assist an organization that furnishes or pays for legal services to others to promote the use of his service *** if the lawyer knows or should have known that:

(1) the promotional activity involves the use of a deceptive statement or a statement that violates the restrictions contained in D.R. 2—101(c); or

(2) the promotional activity involves the use of coercion, duress, compulsion, intimidation, threats, unwarranted promises of benefits, overpersuasion, overreaching, or vexatious or harassing conduct.

\* \* \*

(D) A lawyer shall not accept employment when he knows or it is obvious that the person who seeks his services does so as a result of conduct prohibited under this D.R. 2—103."

Rule 2—103 provides:

"(a) A lawyer shall not by private communication, *** directly or through a representative, recommend or solicit employment of himself *** for pecuniary gain or other benefit and shall not for that purpose initiate contact with a prospective client.

(b) A lawyer may initiate contact with a prospective client in the following circumstances:

\* \* \*

(3) under the auspices of a public or charitable legal services organization or a *bona fide* political, social, civic, charitable, religious, fraternal, employee or trade organization whose purposes include but are not limited to providing or recommending legal services.

(A) A lawyer shall not assist such an organization to promote the use of his services *** if the lawyer knows or should know that the communi-

cations of the organization would be in violation of Rule 2—103(c) if made by the lawyer.

(c) In no event may a lawyer initiate a contact with a prospective client if:

(1) the lawyer reasonably should know that the physical, emotional, or mental state of the person solicited is such that the person could not exercise reasonable judgment in employing a lawyer;

\* \* \*

(3) solicitation involves coercion, duress, or harassment; or

(4) the communication would be in violation of Rule 2—101 if it were a public communication." 107 Ill. 2d R. 2—103.

It cannot reasonably be contended that the described solicitations constitute constitutionally protected speech under the first amendment. What was held in *Shapero v. Kentucky Bar Association* (1988), 486 U.S. ___, 100 L. Ed. 2d 475, 108 S. Ct. 1916, is distinguishable. There the Supreme Court struck down an Kentucky attorney disciplinary rule whose terms would have prohibited the following letter from being sent to defendants in mortgage foreclosure actions:

"It has come to my attention that your home is being foreclosed on. If this is true, you may be about to lose your home. Federal law may allow you to keep your home by ORDERING your creditor to STOP and give you more time to pay them.

\* \* \*

Call NOW, don't wait. It may surprise you what I may be able to do for you. Just call and tell me that you got this letter. Remember it is FREE, there is NO charge for calling."

The Court judged that the solicitation was protected by the first amendment. The Court held that a State cannot "categorically prohibit solicitation of legal employment for pecuniary gain through advertisements containing information or advice, even if truthful and

nondeceptive, regarding a specific legal problem." 486 U.S. at ___, 100 L. Ed. 2d at 484, 108 S. Ct. at 1921. See also *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio* (1985), 471 U.S. 626, 85 L. Ed. 2d 652, 105 S. Ct. 2265.

The situation here is clearly different from that in *Shapero*, as the letter solicitation there was judged to be truthful and nondeceptive. The Hearing Board found that the described solicitations here were false and misleading. This court stated in *In re Yamaguchi* (1987), 118 Ill. 2d 417, 424, that findings of hearing panels are entitled to "great weight." (See also *In re Hopper* (1981), 85 Ill. 2d 318.) The first amendment does not protect commercial speech which is "potentially or demonstrably" misleading. *In re R.M.J.* (1982), 455 U.S. 191, 202, 71 L. Ed. 2d 64, 73, 102 S. Ct. 929, 937; *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio* (1985), 471 U.S. 626, 85 L. Ed. 2d 652, 105 S. Ct. 2265.

The finding that the respondent's conduct also violated DR 2–104 and Rule 2–104 was supported by clear and convincing evidence. Those rules provide, in substance, that a lawyer who has given unsolicited advice to a lay person that he should obtain counsel or take legal action shall not accept employment resulting from that advice if: (1) the advice embodies or implies a deceptive statement; (2) the advice involves the use by the lawyer of coercion, duress, compulsion, intimidation, threats, unwarranted promises of benefits, overpersuasion, overreaching, or vexatious or harassing conduct; or (3) was given under circumstances which would be violative of DR 2–101(c) or Rule 2–103. The evidence is that on the respondent's advice, several of Midland's customers authorized him to represent them in the foreclosure action and that as a result he filed appearances on their behalf. As that advice was clearly given under circumstances in-

volving "unwarranted promises of benefits" and "over-persuasion," the respondent's acceptance of employment from those customers constitutes a violation of DR 2—104 and Rule 2—104.

We reject the respondent's contention that the evidence was insufficient to show that he aided Midland or Capital in the unauthorized practice of law in violation of DR 3—101 and Rule 3—101(a). The respondent conceded before the panel of the Hearing Board that, at least in part, the services Midland and Capital provided its customers constituted the practice of law. As to this contention of the respondent, we would observe that during oral argument before us the respondent pointed out that the Administrator, in responding to his motion for judgment on the pleadings, sought leave to withdraw the allegation that the respondent assisted Midland in the unauthorized practice of law. Before the hearing panel, later, however, the Administrator did contend that the respondent had assisted Midland and Capital in the unauthorized practice of law, and the respondent made no protest or objection at that time. Nor did his brief claim there was error in this. We cannot say that the Hearing Board erred under the circumstances in considering that charge of the Administrator.

The undisputed facts in the record also show that the respondent violated DR 3—102(A) and Rule 3—101(a) by sharing legal fees with nonlawyers, namely Midland and Capital. The respondent testified that he was compensated by Midland at $1,000 per week, at least when Midland had the funds to pay him, for services he provided its customers. From Capital he received compensation of between $1,000 and $2,000 a week. The respondent has not shown that the finding that this constituted a violation of DR 5—107(B) and Rule 5—107(b), which prohibit the acceptance of legal fees from a nonlawyer, was not supported by clear and convincing evidence.

We consider that the findings of the hearing panel on the balance of the charges against the respondent were also supported by clear and convincing evidence. The following are those charges and evidence supporting the findings of violations. By agreeing to provide the legal services which Midland and Capital contracted to furnish their customers, it can be concluded that the respondent formed a partnership with a nonlawyer in violation of DR 3—103(A) and Rule 3—103, which provide that "[a] lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law."

The respondent acted in a conflict of interest in violation of DR 5—101(A) and Rule 5—101(a) by providing legal services to Midland's customers and failing to disclose his financial, business, property and personal interest in Midland. DR 5—101(A) and Rule 5—101(a) provide:

> "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

As a substantial shareholder of Midland and as its president, the respondent had an interest, if not an obligation to Midland, to provide advice to customer-clients that was, if possible, simple and inexpensive. The simplest and least costly alternative to suffering foreclosure would be referral of the debtor to a bankruptcy attorney and that was what was done in most instances. The client's best interests, however, might have been served by refinancing or resale. The panel could have judged that the respondent's conduct in referring a debtor to an attorney specializing in bankruptcy in the absence of the client's informed consent created a conflict of interest in violation of DR 5—101(A) and Rule 5—101(a).

The record also supports the Administrator's allegations that the respondent violated DR 2—107 and Rule 2—107, which state that "[a] lawyer shall not enter into an agreement for, charge, or collect an illegal or excessive fee." In essence, Midland and Capital served only as referral services, because in approximately 80% of the cases, the client, for a fee that was egregiously excessive, was merely referred to a bankruptcy attorney who would perform and charge for the legal services he would supply.

There was sufficient evidence, too, that the respondent violated DR 2—111 and Rule 2—110(a)(3) by refusing to make a refund of the $1,000 fee when the client requested a refund upon the respondent's referring the client to a bankruptcy attorney. Too, the evidence shows that the respondent's conduct was in violation of DR 1—102(a)(4) and Rule 1—102(a)(4) in that it involved dishonesty, deceit or misrepresentation.

The evidence was sufficient under the count which charged the respondent with violating Rule 2—103 by improper solicitation of employment. In 1981, the respondent phoned Charles Daniels, who was then a defendant in a foreclosure action, and as a result, Daniels met with the respondent at his office. Daniels testified that the respondent told him that he would save his home for a thousand dollars. Daniels stated that he gave the respondent $500 and never saw him again and that his home was foreclosed on. Rule 2—103(c)(3) provides that a lawyer shall not by private communication solicit employment of himself if the "solicitation involves coercion, duress, or harassment." (107 Ill. 2d R. 2—103(c)(3).) Daniels, like the other mortgage foreclosure defendants, appeared obviously desperate and distraught by the threatened loss of his home. We consider the respondent's unsolicited telephone call and the confident assertion that he would save Daniels' home amounted to

"duress and harassment" within the intendment of Rule 2—103(c)(3). The Supreme Court in *Shapero v. Kentucky Bar Association* (1988), 486 U.S. ____, 100 L. Ed. 2d 475, 108 S. Ct. 1916, held that a letter, truthful and not misleading, directed to a mortgage foreclosure defendant is protected speech under the first amendment, and in doing so the Court distinguished targeted letters from in-person solicitations. The in-person and misleading and untruthful solicitation here was certainly not protected speech under *Shapero*.

The Administrator argues that disbarment of the respondent is warranted because his conduct involved fraud and "exploited society's most weak and vulnerable through the use of false, deceptive and misleading solicitation." He says too that the respondent was deceitful in his representations to the ARDC in that he told the Administrator that he had sold his interest in Midland, which at the time was not true. This was aggravated, the Administrator says, when the respondent later formed "Capital" which carried on the same type of operation as Midland. As stated, the Hearing Board and Review Board recommended a six-month suspension from the practice of law. A sanction recommended by the Hearing and Review Boards, however, is advisory only. (*In re Mitan* (1979), 75 Ill. 2d 118, 124.) The responsibility for the imposition of an appropriate sanction is for this court. *In re Kink* (1982), 92 Ill. 2d 293, 301-02; *In re Winn* (1984), 103 Ill. 2d 334, 337.

The purposes of disciplinary proceedings include the safeguarding of the public interest and the maintenance of the integrity of the legal profession. (*In re Levin* (1979), 77 Ill. 2d 205, 211.) This court strives for uniformity of sanctions to the extent possible (*In re Andros* (1976), 64 Ill. 2d 419, 425-26), but it is recognized that each case presents unique circumstances (*In re Hopper* (1981), 85 Ill. 2d 318, 324).

The misconduct here does warrant substantial discipline. The solicitations were deceptive and were aimed at a class composed largely of unsophisticated and vulnerable persons.

Considering the totality of the circumstances, we consider that a suspension from the practice of law for three years will be an appropriate sanction.

*Respondent suspended.*

JUSTICE STAMOS took no part in the consideration or decision of this case.